**Michael MEEROPOL, a/k/a Rosenberg, et al., Appellants**

v.

**Edwin MEESE III, Attorney General of the United States, et al.**

**No. 84–5283.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 13, 1985.

Decided May 20, 1986.

As Amended May 28, 1986.

Marshall Perlin, New York City, for appellants.

Freddi Lipstein, Atty., Dept. of Justice, with whom Joseph E. diGenova, U.S. Atty., Richard K. Willard, Acting Asst. Atty. Gen. and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on brief, for appellees.

Before BORK and SCALIA, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

On February 20, 1975, Michael and Robert Meeropol made a formal request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (1982), to the Criminal Division of the Department of Justice ("DOJ"), the Offices of the Attorney General and Deputy Attorney General, the Federal Bureau of Investigation ("FBI"), the Central Intelligence Agency ("CIA"), the Energy Research and Development Administration ("ERDA"), and the Offices of the United States Attorneys in the District of New Mexico and in the Southern District of New York. The request to these agencies sought "all of the records relating directly or indirectly to investigation and prosecution of our parents," Letter from Michael and Robert Meeropol to the Office of the Deputy Attorney General (Feb. 20, 1975), Joint Appendix ("J.A.") at 60–62. The Meeropols' parents, Julius and Ethel Rosenberg, had been convicted in 1951 of conspiring to transmit information to the Soviet Union relating to the development of the atomic bomb, and were executed in 1953.

The FOIA request expressly included, but was not limited to, all records relating to any of eleven named persons [1] and the 100 persons on the prosecution's witness list at the Rosenberg trial. The scope of the request was therefore enormous. It was perhaps the most extensive FOIA request ever made. In an interoffice government memorandum, George Calhoun, the Deputy Chief of the Internal Security Section of DOJ, described it as "one of the most definitive requests I have ever seen." Calhoun noted, "I have no doubt in my mind what they want—they want *every-thing* having to do with the Rosenberg case." Calhoun Memorandum, J.A. at 304 (emphasis in original).

On July 14, 1975, plaintiffs filed in federal district court the complaint that initiated these proceedings, charging that the government was willfully failing to pro-

1. The 11 named individuals were Ethel Rosenberg, Julius Rosenberg, Morton Sobell, Anatolai Yakovlev, Klaus Fuchs, Harry Gold, Ruth Greenglass, David Greenglass, Max Elitcher, Oscar Vago, and Abraham Brothman.

duce records to which they were legally entitled. In the ensuing ten years the defendant agencies, under court order, retrieved approximately 500,000 pages of records and released approximately 200,000 of those pages to the defendants. Judge June Green, who presided over the proceedings since their inception, eventually granted the motions for summary judgment filed by each of the defendants over the course of the last seven years. The plaintiffs' claims have now all been dismissed, save those for attorneys' fees and litigation costs. Plaintiffs appeal from the three orders granting summary judgments as well as from an additional order issued in 1984 denying a motion by plaintiffs to require the defendants to turn over certain specific records.

## I.

In order to provide an outline of the course this extraordinarily complex litigation has taken, we will initially set out only the main features of its history. Additional details will be introduced at later points in the opinion, as they become relevant to the legal analysis. For ease of comprehension, we divide the litigation into three chronological phases.

*1975–1977*

The original complaint, filed in July of 1975, charged that the defendants were deliberately withholding records that were relevant under the terms of the request and subject to disclosure. The complaint asked that the defendants be ordered to produce an inventory of the documents in their possession encompassed by the request, with a view to the ultimate release of the documents not specifically exempt from disclosure under FOIA. The complaint also sought an interim order enjoining the defendants from destroying or in any way altering the documents requested.

Complaint, J.A. at 3–48. On August 1, 1975, Judge Green issued an order enjoining the defendants from destroying or in any way altering the relevant documents, J.A. at 59, and on August 27, 1975, she issued a second order requiring each of the defendants, over the course of the next three months, to file inventories of all relevant documents in their possession along with itemized, detailed and cross-referenced refusal justifications for each relevant document claimed to be exempt from disclosure. J.A. at 63–67.[2]

Affidavits were filed in response to the August 27 order. Defendants then moved for partial summary judgment, asking the court to rule that their inventories were complete and that they were in compliance with the August 27 order. ERDA moved as well for a partial summary judgment that the ERDA documents the agency claimed to be exempt from disclosure had been properly withheld. Plaintiffs opposed these motions. Asserting that the inventories were incomplete and inadequate, they asked that the FBI be held in contempt. They also requested permission to conduct depositions of the FBI agents who had supervised the search as a means of examining the thoroughness of the inventories and the validity of the justifications for withholdings. The court responded to the accumulated motions in an order issued on January 20, 1976. Opinion and Order of Jan. 20, 1976, J.A. at 69–74. The court denied the motions for summary judgment, finding that "legitimate questions" had been raised about the completeness of the inventories, and that "given the complexity of this case," the affidavits alone did not establish that every deletion was proper. Therefore, material issues of fact remained. *Id.* at 2, J.A. at 70. "For similar reasons"—*i.e.*, the breadth and complexity of the search requested—the court denied

---

**2.** Ten days before this order was issued, the then-Deputy Attorney General, Harold R. Tyler, Jr., issued a statement in which he directed his subordinates to follow a policy of "maximum possible disclosure of information" in response to FOIA requests concerning the Rosenberg case. The statement also indicated that the

pending requests would be expedited, and that statutory exemptions would be invoked only when there was a "compelling reason to do so." Statement by Harold R. Tyler, Jr., Deputy Attorney General, Exhibits Submitted by Plaintiffs-Appellants and Defendants-Appellees.

the motion to hold the FBI in contempt. "This case involves an extensive request, and it appears that the defendants have made reasonable efforts to comply with the Court's orders." *Id.* at 3, J.A. at 71.

Plaintiffs had specifically complained in an affidavit accompanying their contempt motion that the FBI had searched only its headquarters, and not any field offices, and asked that the field offices be ordered searched as well. Affidavit of Marshall Perlin (Dec. 22, 1975) at 30–31, J.A. at 293–94. The court ruled that an inventory of all fifty-nine field offices would be "counterproductive," but ordered a search and inventory of the Albuquerque field office, since that office had conducted the investigation of one of the key principals, David Greenglass. Opinion of Jan 20, 1976, at 4, J.A. at 72. Finally, the court held the request for depositions in abeyance and ordered that withheld documents be submitted for *in camera* inspection, so that the court could determine whether the statutory exemptions had been properly invoked. It was apparently the court's intention at the time to conduct an agency by agency *in camera* examination of withheld documents. It thus began by requiring ERDA to submit all withholdings claimed under 5 U.S.C. §§ 552(b)(6), 552(b)(7)(C) and 552(b)(7)(D) (1982), and indicated that an FBI submission would be requested next. *Id.* at 3, J.A. at 71. This method of examining documents withheld was discarded in later phases of the litigation and a sampling method employed instead.

In July of 1976, the court issued an order permitting the plaintiffs to depose six named FBI agents and one named DOJ official. Order of July 23, 1976, J.A. at 76. Two of those agents, Thomas Bresson and John Powers, were in fact deposed. Attorneys for the plaintiffs and the FBI then entered into settlement negotiations, which ended in December of 1977 without satis-factory resolution of the outstanding issues.

*1978–1980*

The FBI was the exclusive focus of this phase of the litigation. After the settlement negotiations broke down, Judge Green issued a new order, defining the scope of the search. Order of Jan. 12, 1978 ("1978 Order"), J.A. at 92–94. The purpose of this order was to set out exactly which files the FBI would be required to search in order to "end any debate over the scope of this action." *Id.* at 93. The FBI was ordered to search:

(a) The main subject files in its New York field office for 97 named persons and organizations;

(b) the "see references" in its New York field office for the eleven persons named in the original FOIA request;[3]

(c) the main subject files in its headquarters for 83 named individuals, all of whom were also among the 97 listed in (a); and

(d) the main subject files in the office of origin for each of the 83 named individuals listed in (c) whose office of origin was *not* New York.[4]

As amended one month later, the 1978 Order required the FBI to search, process documents at the rate of 40,000 pages per month and to release all "non-exempt, non-duplicative records." The district court held in abeyance the demand for detailed justifications for records claimed to be exempt. J.A. at 93, 99.

The 1978 Order is central to our review of this case. In defining the scope of the search required of the FBI, the district court established the standard by which the adequacy of the FBI's compliance would later be measured.

On November 19, 1979, the district court granted the FBI's motion for partial sum-

---

3. The "see references" are index cards that list cross-references. If one individual is mentioned in several different files but is not the subject of any of them, a list of those files can be found by looking up that individual's "see references."

4. An individual's office of origin is the field office that was primarily responsible for the investigation of his involvement in the case.

mary judgment, having concluded "that the FBI has complied substantially with the searching, processing and retrieval of documents ordered on January 12, 1978." Order of Nov. 19, 1979 ("1979 Order"), J.A. at 102. The 1979 Order is one of the four orders from which plaintiffs appeal.

Having determined that the FBI's search was adequate, the district court turned next to the validity of the exemptions claimed by the FBI as justifications for the documents it had retrieved but refused to release. The court ordered that "from the approximately 20,000 totally and substantially withheld documents" (this later turned out to be too low an estimate), the FBI would be required to submit every one-hundredth document for *in camera* examination. Order of Feb. 8, 1980, J.A. at 104. The documents were to be selected at random, by counting out all documents withheld and removing each hundredth. In using the term "documents," the court was apparently referring to "pages." Thus every one-hundredth document would not necessarily be an entire individual record, but would often be one page of a larger record. In response to this order, the FBI filed a 301-page sample of pages totally or substantially withheld under FOIA exemptions, and moved for summary judgment. The court examined the sample *in camera* and concluded that the statutory exemptions had been properly invoked. On September 29, 1980, it therefore granted the motion for summary judgment, dismissing all of plaintiffs' claims against the FBI with prejudice. Order of Sept. 29, 1980 ("1980 Order"), J.A. at 105. The 1980 Order is the second order from which plaintiffs appeal.

*1981–1984*

In the final phase of this litigation, the court dealt with the claims against the remaining defendants, repeating the procedure it had used with respect to the FBI. Once again, the court issued an order defining the scope of the search, and once again, it used a sampling technique to judge the validity of the withholdings.

In January of 1981, the court issued the order—one to which all parties stipulated—defining the scope of the search with respect to the remaining defendants. Order of Jan. 13, 1981 ("1981 Order"), J.A. at 106–09. Just as the 1978 Order had defined the scope of the FBI's search so as to "end any debate over the scope of this action," so too did the 1981 Order "define[ ] the scope of the search for records which each ... agency or component (except the FBI) shall have made in order to comply with plaintiff's (sic) pending request under the FOIA." *Id.* at 106. The court then listed, agency by agency, the records defendants would be required to search, specified again by the names of the persons to which the records pertained.

On January 7, 1983, the court ordered the remaining defendants to submit every one-hundredth page totally or substantially withheld for *in camera* examination, and defendants complied. Order of Jan. 7, 1983, J.A. at 114–15. On June 2, 1983, the court ordered released to plaintiffs a number of records that had been withheld, on the grounds that they were disclosable under the terms of the policy statement issued by the Deputy Attorney General, *see supra* note 2. Order of June 2, 1983, J.A. at 116–17.

On February 29, 1984, the court issued an eighty-two page memorandum dismissing all of the remaining claims against all of the remaining defendants, with the exception of those claims involving attorneys' fees and litigation costs. In the same memorandum, the court denied plaintiffs' motions seeking further depositions and asking that the 1979 Order and the 1980 Order be vacated. In addition, since the 1979 Order and the 1980 Order had not included findings of fact and conclusions of law, the relevant findings and conclusions were incorporated in this memorandum. Memorandum Opinion of Feb. 29, 1984 ("1984 Memorandum Opinion"), J.A. at 121–202.

The court indicated that further discovery was "not necessary," because the affidavits already submitted provided suffi-

cient basis for a ruling. 1984 Memorandum Opinion at 3, J.A. at 123. The court went on to note:

> The Court recognizes the difficulties faced by plaintiffs in the early stages of this FOIA litigation as a result of inadequate searches by a number of defendants, most notably the FBI. A great deal of progress, however, has been made since that time. The affidavits, as well as the numerous documents that have been released to plaintiffs, indicate to the Court that finally, defendants have met their burden of conducting adequate searches for these documents and have provided the Court with sufficiently detailed affidavits to enable the Court to determine whether the FOIA exemptions were properly invoked.

*Id.* at 4, J.A. at 124.

After reviewing the elements of the search conducted by the FBI, the court reaffirmed its conclusions that the FBI had "complied substantially with the searching, processing, and retrieval of documents ordered in January 1978," 1984 Memorandum Opinion at 16, J.A. at 136, and that the FBI had applied the exemption provisions of FOIA "diligently and in good faith to the approximately 450,000 pages of records that the FBI retrieved in response to the August 1975, January 1976, and January 1978 Orders." *Id.* at 80, J.A. at 200.

With respect to the other defendants, the court found that 13,000 records had been searched in 1975, with many additional records searched in response to the 1981 Order. The court held that the remaining defendants had conducted an adequate search in response to the 1981 Order, and that they "need not conduct any further searches for records responsive to plaintiffs' FOIA request." 1984 Memorandum Opinion at 81, J.A. at 201. Furthermore, after a detailed exemption-by-exemption analysis of the *in camera* submission, the court held that the exemptions had been properly applied. *Id.* at 82, J.A. at 202. Accordingly, all claims, except those involving fees and costs, were dismissed. Plain-

tiffs appeal from the order accompanying the 1984 Memorandum Opinion.

Finally, the court issued on the same day a separate Memorandum Order responding to a motion by plaintiffs for an order directing the FBI and the CIA to "deliver an itemized inventory and copies of documents in their care, custody, possession or control, dated or received from January 1, 1970, to the present, relating directly or indirectly to Alfred E. Sarant, a/k/a Alfred Sarant, and Joel Barr." Memorandum Order, J.A. at 118–20. The court denied the motion, finding that the defendants had already searched and processed the files in question. The court ruled that plaintiffs had not presented sufficiently specific evidence suggesting that relevant, undisclosed information remained in agency files, and characterized plaintiffs' claims that such files did exist as "conjecture." *Id.* at 2, J.A. at 119. Plaintiffs appeal from this order as well.

To summarize: The 1978 Order defined the scope of the search that would be required of the FBI. The 1979 Order granted partial summary judgment to the FBI, the court having found that the FBI's search constituted adequate compliance with the terms of the 1978 Order. The 1980 Order dismissed all claims against the FBI, the court having found—after an *in camera* examination of a 301-page sample—that the records that had been searched but withheld under FOIA exemptions were properly withheld. In the 1981 Order, the parties stipulated to a final definition of the search that would be required of the remaining (*i.e.*, non-FBI) defendants. In its 1984 Memorandum Opinion, the court found both that a search had been carried out sufficient to satisfy the terms of the 1981 Order, and—after an *in camera* examination of sixty pages wholly or substantially withheld—that the statutory exemptions had been properly invoked. In an order issued simultaneously, the court denied plaintiffs' motion for the production of additional records relating to Sarant and Barr. Plaintiffs appeal from the 1979 Order, the 1980 Order, the order accompanying the 1984 Memorandum Opinion and the

order denying their motion for the records relating to Sarant and Barr. We discuss the grants of summary judgment to the FBI in Part II, and the other orders from which appeals have been taken in Part III.

## II.

### A.

All who participated in this litigation now agree that the searches conducted by the FBI between the years 1975 and 1978 were, as the district court said, "inadequate." 1984 Memorandum Opinion at 4, J.A. at 124. Appellants regard the poor quality of those searches as constituting "willful ... and gross disobedience" of the district court's orders, Affidavit of Marshall Perlin (Dec. 22, 1975) at 32, J.A. at 295, while appellees attribute the unsatisfactory attempts to the fact that "the FBI in 1975 lacked experience implementing FOIA and the 1974 FOIA amendments." Brief for the Defendants-Appellees at 3. Although the FBI during this period apparently did not search for records relating to the 100 witnesses at the Rosenberg trial, it did process the main subject files and see references at FBI Headquarters pertaining to the eleven named principals, *see supra* note 1. 1984 Memorandum Opinion at 10, J.A. at 130. As a result, approximately 72,000 pages from the main files were inventoried. Of those 72,000, approximately 28,000 were released to appellants (some with deletions), approximately 31,000 were determined to be not relevant to appellants' request, and approximately 13,000 were withheld pursuant to statutory exemptions. Seventh Affidavit of Thomas H. Bresson (Jan. 8, 1976) at 11, J.A. at 315. Additionally, the search of the see references led to the retrieval of approximately 9,000 other files. Eighth Affidavit of Thomas H. Bresson at 7, J.A. at 348A.

The inadequacy of these searches by the FBI coupled with the inability of the parties to reach a settlement prompted the district court to issue the 1978 Order defining with specificity the scope of the search that the FBI would be required to complete. The Meeropols' original request

sought all records "relating directly or indirectly" to the investigation and prosecution of the Rosenbergs and specified records relating to the eleven principals and the 100 witnesses, as well as records of any post-trial investigations that had been conducted. Letter from Michael and Robert Meeropol to the Office of the Deputy Attorney General (Feb. 20, 1975), J.A. at 60–62. The 1978 Order defined the scope of the required search by directing the FBI to search the main files in its New York field office on ninety-four individuals and three organizations, the ninety-four consisting of the eleven principals and most of those on the witness list, as well as names that fell in neither category (such as Judge Irving Kaufman, who had presided at the trial). It was directed to search the see references in the New York field office relating to the eleven principals. It was directed as well to search the main files at FBI Headquarters on most, but not all, of the names for which a search of the New York field office was required, and to search the main files at the office of origin for any of those in that group whose office of origin was not New York.

██ In so particularizing the original request, the trial judge inevitably narrowed to some degree the universe of records the FBI was required to process. Such an order was necessary both to focus the FBI on the files it would be required to examine and to provide a measure by which compliance would later be judged. In order to make this enormous task doable and the litigation controllable it was essential that a request without definable limits be given specificity. The issuance of an order of this sort, to be sure, means that some records arguably within the category originally requested—in this case, "all of the records relating directly or indirectly to investigation and prosecution" of the Rosenbergs—might now be outside the boundaries of the required search. That is inevitable, however, and does not render a search conducted under the terms of the order infirm, for in determining whether an agency has discharged its responsibilities

"the issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate.*" *Weisberg v. United States Department of Justice,* 745 F.2d 1476, 1485 (D.C.Cir.1984) (emphasis in original). *Accord Goland v. CIA,* 607 F.2d 339, 369 (D.C.Cir.1978) (on petition for rehearing), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). As we have noted in the past, "the competence of any records-search is a matter dependent upon the circumstances of the case." *Founding Church of Scientology v. National Security Agency,* 610 F.2d 824, 834 (D.C.Cir.1979).

The request at issue here may well be the most demanding FOIA request ever filed; it has even been cited as an example of the substantial demands FOIA requests may make on an agency's resources. *See Long v. United States Internal Revenue Service,* 596 F.2d 362, 367 (9th Cir.1979) (noting that sixty-five full-time and twenty-one part-time FBI employees were at one point assigned solely to the processing of the Meeropol request). The 1978 Order, issued to "end any debate over the scope of this action," 1978 Order at 2, J.A. at 93, reflected the district court's judgment that a search by the FBI that fulfilled the terms of that order would constitute a reasonable and sufficient search with respect to the request made in 1975. Neither party to this appeal has suggested in its briefs or its oral argument that the 1978 Order was in any way improper, and we do not ourselves see any grounds for reaching that conclusion independently. In reviewing the district court's grant of partial summary judgment to the FBI with respect to the adequacy of its search, we therefore evaluate that search in terms of its compliance with the 1978 Order.

The appellees filed below a detailed affidavit by Laurence E. Fann, Special Agent of the FBI, who had supervised the search of records in response to appellants' FOIA request. J.A. at 830–47. Fann explained that he had supervised the search of all the main files at FBI Headquarters required by

the 1978 Order through alphabetical indices to the Central Records System, Third Affidavit of Laurence E. Fann (June 4, 1979) at 2, J.A. at 831, as well as the Electronic Surveillance ("ELSUR") Indices at Headquarters, at the New York field office, and at the required offices of origin, *id.* at 3, J.A. at 832. All files thus listed were retrieved and reviewed for relevance. *Id.* at 4, J.A. at 833. Additionally, the FBI reviewed Headquarters files to determine the office of origin of each of the named subjects, and directed the appropriate offices of origin to conduct the necessary searches of their main files. *Id.* at 5, J.A. at 834. Elaborate computer printouts were produced, providing an inventory of files, subjects, file numbers, sections and volumes, subfiles, bulky enclosures and exhibits, numbers of pages reviewed and numbers of pages released. *Id.* at 8–10, J.A. at 837–39. Similar computer printouts were provided to list the see references, identifying the main subject files to which the see references were cross-referenced. *Id.* at 11, J.A. at 840. Copies of these computer printouts were furnished to appellants. Finally, the FBI responded to inquiries made to them by appellants' attorneys concerning 150 files to which references had been made in documents previously released, but which had not themselves been released. Of those 150, according to the Fann Affidavit, most had either in fact been produced or were not within the scope of the 1978 Order, or had been destroyed during routine destruction procedures. Ten of them were relevant and responsive, and were produced. *Id.* at 15–17, J.A. at 844–46. "As a result of the indices searches and the research efforts ... a total of 198 main subject files responsive to the Court's Order were retrieved, processed and all nonexempt material released to the plaintiffs. This represents 1,386 sections or volumes, 257 subsections or volumes, 172 enclosures behind file (EBF) and 106 bulky exhibits." *Id.* at 17–18, J.A. at 846–47. The Special Agents delegated to supervise the search of the New York field office filed affidavits as well, attesting to their search of the files

listed in the 1978 Order. Affidavit of Jerome O. Campane, J.A. at 825–26; Affidavit of Arcangelo Di Stefano, J.A. at 827–29.

The district court incorporated into its 1984 Memorandum Opinion its findings of fact relating to the FBI search, with respect to which it had granted partial summary judgment five years earlier. In those findings of fact, the court adopted the accounts given in the affidavits filed by appellees. 1984 Memorandum Opinion at 14, J.A. at 134. In so doing, the district court accorded those affidavits the "presumption of good faith" to which they are entitled, *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C.Cir.1981). As we have previously held, such affidavits need not

> set forth with meticulous documentation the details of an epic search for the requested records. Rather, in the absence of countervailing evidence or apparent inconsistency of proof, affidavits that explain in reasonable detail the scope and method of the search conducted by the agency will suffice to demonstrate compliance with the obligations imposed by the FOIA.

*Perry v. Block*, 684 F.2d 121, 127 (D.C.Cir. 1982). We turn, therefore, to the claims presented by appellants of "countervailing evidence" and "inconsistencies of proof."

■ Appellants have charged the FBI throughout this litigation with bad faith. While the district court's 1984 findings are to the contrary, it did characterize the FBI's behavior in 1975 as "intransigen[t]," but found this explained, though not justified, by inexperience with the FOIA and the "extraordinary scope" of the request. 1984 Memorandum Opinion at 11 & n. 2, J.A. at 131. As we noted in Part I, the district court did not view the FBI's post-1978 search efforts as suffering from the same deficiency, and concluded that "reasonable searches had been conducted." *Id.* at 37, J.A. at 157. We agree with the district court that the earlier intransigence ought not count against appellees if their later behavior was characterized by cooperation. "In the absence of other evidence, the institution of a *de novo* search significantly undercuts appellant's argument that earlier noncooperation by the [agency] raises a substantial question of current bad faith on the part of the [a]gency. Indeed, if the release of previously withheld materials were held to constitute evidence of present 'bad faith,' similar evidence would exist in every FOIA case involving additional releases of documents after the filing of the suit." *Ground Saucer Watch, Inc.*, 692 F.2d at 772.

Appellants, however, detect no such change in the FBI's attitude. As proof of continuing bad faith, they describe occasions—all *after* the FBI had claimed to have completed its search in response to the 1978 Order—on which the FBI uncovered responsive files only because evidence of their existence was supplied by the Meeropols and their attorneys. Through meticulous research and examination of the files that were turned over to them, appellants were able in several instances to uncover references to other, seemingly relevant, files which had not been produced. Their inquiries concerning these files were forwarded to the FBI. Thus, for example, in response to appellants' report to the court of October 18, 1978, which had detailed some of the fruits of this research, the FBI discovered and produced twelve new main files and several new subfiles totalling 3,575 nonexempt pages, all within the scope of the 1978 Order and never previously released to the appellants. Affidavit of Bonnie Brower (Nov. 19, 1978) at 2, J.A. at 776. Later submissions of a similar sort resulted in additional disclosure, with the FBI processing a total of 37,837 additional pages, 5,045 of which were released to appellants. Affidavit of Marshall Perlin (Aug. 8, 1979) at 17, J.A. at 864. To appellants, this indicates that the searches must have been conducted in bad faith, and that there are additional records yet to be found.

■ We are not prepared to suggest that there are no relevant records that have thus far remained undiscovered. As we have already explained, however, a search is not unreasonable simply because

it fails to produce all relevant material; no search of this size, dating back four decades, will be free from error. And we find the incidents cited by appellants suggest not bad faith, but rather that the FBI was cooperating with appellants by meeting with them repeatedly, responding to their inquiries, conducting numerous additional searches, and producing records when error was discovered. *See* Third Affidavit of Laurence E. Fann (June 4, 1979) at 15, J.A. at 844. In *Military Audit Project v. Casey,* 656 F.2d 724, 754 (D.C.Cir.1981), we "emphatically reject[ed]" the notion that an agency's disclosure of documents it had previously withheld renders its affidavits suspect, and our reasoning in that case is applicable here as well. We observed that such a line of argument, if accepted, "would work mischief in the future by creating a disincentive for an agency to reappraise its position, and when appropriate, release documents previously withheld." *Id.* Were the court to thus "punish flexibility," it would "provide the motivation for intransigence"; the argument in favor of doing so is "based on the perverse theory that a forthcoming agency is less to be trusted in its allegations than an unyielding agency." *Id.* It would be unreasonable to expect even the most exhaustive search to uncover *every* responsive file; what is expected of a law-abiding agency is that it admit and correct error when error is revealed. This the FBI has done. We find here, as in *Military Audit Project,* that the additional releases suggest "a stronger, rather than a weaker, basis" for accepting the integrity of the search, and we reject, as did the district court, appellants' allegations of bad faith. *Id.*

■ Appellants' other set of challenges to the adequacy of the FBI search consists in identifying files they believe to exist which have not been turned over. In most cases, their conclusion that such files exist stems either from their discovery of references to these files in other documents, or from a conviction that a particular subject was of such importance that a file on that subject *must* have been created. As we already have indicated, the FBI in fact released to appellants several previously undisclosed files about which they raised inquiries. Our survey of the record below convinces us that the remaining records sought are for the most part either records which are outside the scope of the 1978 Order or records whose existence remains purely hypothetical.

Appellants claimed below that there were at least 126 relevant main files which had not been produced. The existence of many of these main files has been deduced simply by virtue of their supposed subject matter. Thus, for example, appellants have received no main file on Ruth Greenglass, and asserted below that given her importance to the case it is "inconceivable" that no such file exists. They concluded as well that documents relating to Klaus Fuchs had been withheld from them because

> [t]he earliest date of any document on Klaus Fuchs from the two files thus far searched and inventoried by the FBI is August 17, 1949. Yet Fuchs was a top nuclear scientist on the atomic bomb project in Los Alamos, subject to the closest security clearance procedures and to continuing investigation and surveillance. An escapee from Hitler's Germany, the United States government had documents in its possession in the early to mid-1940's indicating his communist activities in Germany. Further, his sister and brother-in-law have documents in *their* files indicating investigation and surveillance of them in 1945 and their relationship to Fuchs.

Plaintiffs' Report to the Court on the Status of Defendant FBI's Compliance with the Orders of this Court at 4, 6, J.A. at 682, 684 ("Plaintiffs' Report"). There are numerous other claims of similar tenor. These claims cannot be conclusively refuted, since to do so the government would have to prove a negative—that the files in question do not exist. We agree with the district court that these assertions are insufficient to raise material questions of fact with respect to the adequacy of the search. The FBI was able to address many

of the inquiries with precision; for example, there was no separate file on Ruth Greenglass because she was carried "as a co-subject in the main subject file of her husband, David Greenglass." Second Affidavit of Laurence E. Fann (Nov. 9, 1978) at 10, J.A. at 722. In response to some of the other inquiries, such as that on Klaus Fuchs, the FBI has only been able to state that "[a] search of the FBI's alphabetical indices has been done for each individual or organization listed in the Court's orders, and the files so located have been processed for release *as they exist today.*" *Id.* at 7, J.A. at 719 (emphasis in original). In the absence of more concrete evidence from appellants that such files actually exist, their speculative assertions cannot serve as the basis for vacating the grant of partial summary judgment. "Even if we assume that the documents plaintiffs posit were *created*, there is no reason to believe that the documents, thirty years later, still exist, or, if they exist, that they are in the possession of the [agency]." *Goland*, 607 F.2d at 353 (emphasis in original).

With regard to the files that appellants believe to exist by virtue of references found in other documents, the FBI has provided a detailed serial-by-serial accounting. Second Affidavit of Laurence E. Fann (Nov. 9, 1978) at 26–60, J.A. at 738–73. Many of the designated files had been destroyed in the intervening decades. Other proffered serial numbers did not correlate with any files at all. In still other instances, appellants have discovered the existence of a particular file because one of the see references to which they were entitled came out of that file. In such cases, however, the entire file is not necessarily responsive to the 1978 Order, and appellants have properly been given only that material within the file that *is* responsive. *See Irons v. Levi*, 451 F.Supp. 751, 753 (D.Mass. 1978) (requester only entitled to that portion of the file listed in see references), *vacated and remanded on other grounds*, 596 F.2d 468 (1st Cir.1979). In sum, we think the affidavits supplied by the FBI describe an adequate and diligent search both as originally instituted in response to

the 1978 Order and in the course of responding to the inquiries that subsequently were raised, and we see no countervailing evidence substantial enough to counter the "substantial weight" we traditionally accord agency affidavits in cases such as these. *Goland*, 607 F.2d at 352.

■ Most of our discussion of these main files is equally applicable to the other absent files to which appellants claim they are entitled. Appellants seek certain files designated "control files," which, we are told, are files used to coordinate major investigations. Appellants have received certain material within these control files— through see references—but seek the entire files. The FBI explained that

control files are not created in each and every investigative matter or program. The search of our indices has not revealed any control file established to administrate the Rosenberg investigation. My review of the documents shows that this investigation was in fact directed, supervised, and controlled through the main subject case files. However, individuals listed on the Court's Order were mentioned (are "see references") in control files created to handle other matters. These references were in fact retrieved and processed and the non-exempt material furnished plaintiffs. The quotation set forth on pages 15 and 16 of Plaintiffs' Report to the Court is from a "see reference" in a control file captioned in *neither* the name of the Rosenbergs nor of any other individual or organization set forth in the Court's orders.

Second Affidavit of Laurence E. Fann (Nov. 9, 1978) at 20, J.A. at 732 (emphasis in original). Appellants, in contrast, claim that at least some of these control files carry as *subjects* persons encompassed in the 1978 Order. Affidavit of Bonnie Brower (Nov. 19, 1978) at 9, J.A. at 783. It appears to us, however, that appellants have in mind an overly expansive understanding of what it is that makes some individual the "subject" of a file. In elaborating on their claims to these control files, appellants assert that

it is clear from the few documents that we have received from a number of these files, that persons named in the Court's orders are central subjects of the investigations in these control files, which the attached exhibits conclusively demonstrate are directly related to the Rosenberg-Sobell investigation. The fact that the "caption" or name of these control files may not be in the names of these persons is absolutely irrelevant to the importance of these control files in the Rosenberg-Sobell investigation, a fact that the FBI itself does not even deny. Never did plaintiffs restrict their request, nor the Court limit its orders, to files bearing only the names of the persons listed by plaintiffs.

*Id.* at 11, J.A. at 785. We read the district court's 1978 Order somewhat differently than do appellants. The 1978 Order required a search, *inter alia*, of the Headquarters, New York field office, and other offices of origin for the "main subject files for the persons and organizations listed." The possible existence of substantial amounts of generally relevant material in these control files does not entitle appellants to the entire files, for they are not "main subject files *for* the persons ... listed." In other words, we think the file caption not at all "irrelevant" to the question whether a file fits within the scope of the 1978 Order. This may seem a mere semantic distinction, but it is not. The district court clearly distinguished between the long list of persons whose main subject files would be searched in their entirety and the much shorter list of persons whose see references would be searched as well. To hold that the FBI was deficient in not searching the entirety of files which had substantial numbers of see references inside them would be to rewrite what we have already held to be an entirely appropriate court order, an order to which the Meeropols did not object on appeal.

Appellants argue in addition that they are entitled to files on government informers involved in the Rosenberg investigation. According to appellants,

[t]he records of this case reveal literally hundreds of informers who were informing on the counsel, who were informing on the individuals encompassed by the Court's order as well as the two organizations. The sole informer files plaintiffs have obtained are those of Bentley and the Elitchers. The FBI has refused to process the file of Tartakow and other known informers as well as other informer files....

Plaintiffs' Affirmation in Opposition at 23, J.A. at 870. Again, the fact that there were hundreds of informers does not demonstrate that hundreds of informer files were created, and even the assumption that hundreds of informer files were created in the 1940's does not, if accepted, demonstrate that they exist today. The term "informer files" does not denominate some separate category of files; appellants are merely referring to those main files the subjects of which are specific informers. These files were searched when the main files were searched. Appellants' specific interest in a file on Jerome Tartakow, "who has publicly proclaimed himself to be an informer against Julius Rosenberg during the trial," Affidavit of Bonnie Brower (Nov. 19, 1978) at 20, J.A. at 794, was not satisfied because Tartakow's name was not listed in the 1978 Order.

■ Appellants describe several other categories of files, the absence of which they cite as proof of the inadequacy of the search. For many of the same reasons, we find their remaining arguments unpersuasive. The district court had ordered the FBI in 1976 to search its Albuquerque field office, *see supra* p. 947, but the FBI only partially complied. Appellants now seek full compliance—a search not only for references to the eleven principals, which the FBI conducted upon issuance of that order, but for those records relating to the full witness list as well. They once again ignore the superseding 1978 Order, which defined those offices of origin whose search would be required. Appellants believe there exist electronic surveillance logs which they have not received, but the FBI agents attested to having searched the EL-

SUR indices in both Headquarters and the field offices. *See* Affidavit of Jerome O. Campane, J.A. at 825; Third Affidavit of Laurence E. Fann (June 4, 1979) at 3, J.A. at 832. Appellants have made reference as well to files labeled "62 and 66 Classification files" as well as "0 and 00 files," Brief for the Appellants at 26, but have provided no information either below or on appeal from which we could determine what precisely those files are or why appellants have reason to believe they may exist.

We recognize the difficulty a FOIA requester has in demonstrating that a file he has never seen in fact exists. That will often be almost as difficult a task as that the government faces when it seeks to demonstrate that a specific file does *not* exist. But a search need not be perfect, only adequate, and adequacy is measured by the reasonableness of the effort in light of the specific request. Several dozens of full-time and part-time FBI employees have worked over the course of several years, searching and processing hundreds of thousands of pages of documents dating back to the early 1940's and located in FBI Headquarters and field offices across the country. The appellees' detailed affidavits attest to the breadth of the search. Appellants' claims of bad faith are unconvincing, and the files claimed to be missing for the most part are either documents outside the scope of the search, documents that had been destroyed under routine procedures, documents which have subsequently been turned over, or documents whose existence remains purely a matter of unsupported speculation. The search conducted by the FBI was therefore reasonable and adequate, and we affirm the district court's grant of partial summary judgment on that issue.

### B.

In January of 1976, the district court ordered ERDA to submit for *in camera* inspection all ERDA records searched but withheld "on the grounds of invasion of personal privacy, or described as not pertinent or not relevant" to appellants' FOIA request. Order of Jan. 20, 1976, J.A. at 73–74. Two months later, the court ordered the FBI to submit the first 200 documents listed in its inventory that were withheld "in total or in part based on exemptions under 5 USC 552(b), except for those withheld under 5 USC 552(b)(1) or (b)(3), or because the material was described as not relevant or not pertinent." Order of Mar. 18, 1976, J.A. at 75.

The court was unable to judge the validity of the exemptions claimed, however, because it found the justifications submitted by the FBI to explain the exemptions inadequate. The justifications generally did little more than list the file number, subject, serial and date of the document, and indicate under which exemption it had been withheld. As Judge Green explained at one of the hearings:

> They do not particularize what they are leaving out. They do not say why they cannot be partially released with deletion. They do not do anything except make blanket statements, and it has been an inordinate job for this Court. The Court isn't going to do it anymore. It really doesn't believe it is its job to do the Government's work for it in that regard. We want and we insist upon having proper papers that show what it is and what they contain and why the government feels they are not releasable.

Hearing of July 22, 1976, at 13, J.A. at 447.

It was not until after the court had issued the 1978 Order defining the search, after the FBI had executed that new search, and after the court had granted the FBI partial summary judgment with respect to the adequacy of that search that the court returned to the question of the propriety of the withholdings. The number of documents at issue was now substantially greater. The court therefore devised a sampling procedure to test the validity of the exemptions claimed. The FBI was ordered to submit for *in camera* inspection one out of every 100 pages totally or substantially withheld. Those pages were chosen at random, by removing every hundredth from the pile of those withheld,

organized alphabetically by subject matter. In addition to the sample, the FBI submitted public affidavits describing the exemptions claimed and correlating them with each page in the sample to which they related.[5] When the attorney for appellants suggested that a 1% sample was "much too small," the court responded:

> Let me say, Mr. Perlin, that it's a greater percentage than has ever been utilized. Furthermore, we have never had, even with the Martin Luther King papers, such volume, such an extended search granted by the courts, as a matter of fact, as in this case where we have given all of those people on the witness list and all that sort of thing.

> It's made an extensive job. It's also made it an extensive job not only for the attorneys in the case but also for the Court. Now it seems to the Court that to have this Court adequately study these things, not just rubber stamp it, 200 is quite a sizable undertaking to do, with everything else the Court has to do.

> And the Court does indicate it will do it personally.

Hearing of Dec. 18, 1979, J.A. at 969M.[6] Judge Green declined to review the documents that contained only partial deletions, believing that the compilation of totally and substantially withheld documents would present "an adequate sampling of the whole situation." *Id.* at 969L–969M.

On the basis of the *in camera* sample and the public affidavits and justifications, the court granted summary judgment to the FBI with respect to the validity of the exemptions it had claimed. The findings of fact and conclusions of law on which this judgment was based were incorporated into the 1984 Memorandum Opinion. Documents had been withheld under the exemptions codified as 5 U.S.C. § 552(b)(1), (2), (3), (6), (7)(C), and (7)(D) (1982).

Under Exemption 1, which authorizes the withholding of documents classified under an Executive order "to be kept secret in the interest of national defense or foreign policy," 5 U.S.C. § 552(b)(1) (1982), the court found that the FBI had properly refused to disclose documents pertaining "to such things as the activities of the United States abroad; intelligence methods or techniques; cooperation of the United States with a foreign government; and foreign government documents." 1984 Memorandum Opinion at 42, J.A. at 162. Additionally, the court concluded that "all reasonably segregable material was released." *Id.* at 43, J.A. at 163. Exemption 2 protects from disclosure matters "related solely to the internal personnel rules and practices of an agency," 5 U.S.C. § 552(b)(2) (1982), and the court found appropriate the FBI's withholding under Exemption 2 of pages "which relate to the special handling or dissemination of sensitive intelligence data contained therein." 1984 Memorandum Opinion at 46, J.A. at 166.

Records "specifically exempted from disclosure by statute" are withheld under the authority of Exemption 3, 5 U.S.C. § 552(b)(3) (1982), and the court upheld the withholding of grand jury testimony and records on the basis of Rule 6(e) of the Federal Rules of Criminal Procedure, and the withholding of tax return information under 26 U.S.C. § 6103 (1982). "[P]ersonnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy" are exempt from disclosure under 5 U.S.C. § 552(b)(6), and the district court held legitimate the government's reliance on Exemption 6 "to withhold various matters, including the identities of third per-

---

**5.** After the FBI was granted full summary judgment, the court turned its attention to the other defendant agencies. In the course of those searches, these agencies discovered FBI documents, which were referred to the FBI for processing. This led to the release of some additional FBI records. Approximately 500 pages of these records were withheld, and the FBI therefore submitted to the court in February of 1982 a five-page sample of the newly withheld documents, along with written justifications. Declaration of Richard C. Staver, J.A. at 1158.

**6.** The 200-page estimate proved to be incorrect. The sample consisted of 301 pages.

sons named in Navy Loyalty Board proceedings; assessments of the character, trustworthiness, stability or other attributes of candidates for CIA security clearances; the names of scientists who were subjected to routine security investigations and cleared in connection with the *Rosenberg* case; and the names of individuals who were prompted by the *Rosenberg* case to contact the government." 1984 Memorandum Opinion at 64, J.A. at 184.

Exemption 7(C) protects "records compiled for law enforcement purposes" the disclosure of which would constitute an "unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C) (1982). The court found that the FBI had invoked Exemption 7(C) to delete material relating to third parties—"individuals other than those whose records the FBI has been directed by this Court to process." 1984 Memorandum Opinion at 69, J.A. at 189. The material so deleted included medical records, employment records, information concerning the reputations, education, organizational affiliations and personal associations of these third parties, and other information having "nothing to do with the Rosenberg case" which might be "defamatory, embarrassing, or very personal." *Id.* at 69–70, J.A. at 189–90. Finally, the court upheld the refusal to produce certain records which might reveal the identity of a confidential source, withheld pursuant to 5 U.S.C. § 552(b)(7)(D) (1982). Additionally, the court agreed with the FBI that certain materials relating to congressional testimony were not "agency records" under FOIA, since the statute explicitly excludes Congress from its definition of "agency" in 5 U.S.C. § 551(1)(A) (1982). 1984 Memorandum Opinion at 78, J.A. at 198–99.

Appellants do not challenge the withholding under any of these exemptions in particular. Instead, they challenge the sampling procedure through which the withholdings were analyzed.

■■■ A judge hearing a claim under FOIA is not obligated to conduct an *in camera* review of the documents withheld;

the decision to do so is discretionary. *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224, 98 S.Ct. 2311, 2318, 57 L.Ed.2d 159 (1978). The court may grant summary judgment in favor of the government simply on the basis of the affidavits, if they "contain information of reasonable detail, sufficient to place the documents within the exemption category, and if the information is not challenged by contrary evidence in the record or evidence of agency bad faith." *Lesar v. United States Department of Justice*, 636 F.2d 472, 481 (D.C.Cir.1980). At the same time, a finding of bad faith or contrary evidence is not a prerequisite to *in camera* review; a trial judge may order such an inspection "on the basis of an uneasiness, on a doubt he wants satisfied before he takes responsibility for a de novo determination." *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C.Cir.1978). While Judge Green did not indicate her reasons, we believe that both the inadequacy of the previous justifications and the size and significance of this FOIA request made some *in camera* review appropriate.

■■■ Sampling procedures have been held to be "appropriately employed, where as here the number of documents is excessive and it would not realistically be possible to review each and every one." *Weisberg*, 745 F.2d at 1490. *Accord Ash Grove Cement Co. v. FTC*, 511 F.2d 815, 817 (D.C.Cir.1975). Upon examining the sample, a court is then able "to extrapolate its conclusions from the representative sample to the larger group of withheld materials." *Fensterwald v. United States Central Intelligence Agency*, 443 F.Supp. 667, 669 (D.D.C.1977). Appellants do not believe that the submission ordered constituted a sufficiently representative sample. The district court examined 1% of the documents totally or substantially withheld, and appellants had argued below that "[a]ny preliminary random sampling would have to be in the 10–20% range." Plaintiffs' Memorandum in Response to Defendants' Supplementary Motion Papers dated July 8, 1980 and in Opposition to Defendants' Motion for Partial Summary Judg-

ment at 7, J.A. at 1114. We think the 1% sample sufficient, and in line with—indeed, larger than—samples previously approved. *See Weisberg.* The affidavits and justifications were, as the district court found, " ' "relatively detailed" and nonconclusory.' " 1984 Memorandum Opinion at 3, J.A. at 123 (*quoting Goland,* 607 F.2d at 352 (*quoting Vaughn v. Rosen,* 484 F.2d 820, 826 (D.C.Cir.1973))). Those justifications relating to documents exempt on national security grounds were somewhat less detailed than the others, but that is inevitable; courts must "recognize that the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects (sic) might occur as a result of public disclosure of a particular classified record," S.Rep. No. 1200, 93d Cong., 2d Sess. 12, *reprinted in* 1974 U.S.Code Cong. & Ad. News 6267, 6290, and the same holds true for detailed public descriptions of the contents of such records. We reject as well the contention that the district court erred in examining sample *pages,* rather than entire documents. Some of these documents were over 100 pages long. Since the pages sampled were from documents which were all totally or substantially withheld, the FBI was maintaining that no segregable, non-exempt material existed within them. Such claims may properly be tested through an examination of randomly selected pages.

The 301-page *in camera* sample included seventy-five pages of records that had been released in the first phase of this litigation, before the 1978 Order defined the scope of the search. Prior to submitting the sample to the court, the FBI reexamined those pages and determined that several of the claimed exemptions, while proper when claimed, would not have been applicable had the documents been processed in 1979. In many instances, this was a result of the increased disclosure permitted by Executive Order No. 12,065, 3 C.F.R. 190 (1979) (effective Dec. 1, 1978), which articulated a

standard for classifying matters relating to national security that superseded Executive Order No. 11,652, 3 C.F.R. 339 (1974), the policy in effect when the earlier records were withheld. Other records would have received different treatment in 1979 had they been processed at that time simply because the governing case law had evolved somewhat in the intervening years. The FBI released those pages in the sample which were newly disclosable, but did not reprocess the tens of thousands of other pages withheld. Had they done so, more records might well have been turned over to the appellants, for in addition to the documents processed in 1975 many of those documents processed in response to the 1978 Order had been processed before the effective date of the new Executive Order.

▬ The fact that there are documents which while properly withheld at the time the decision to withhold was made were nevertheless not exempt under *new* standards does not indicate error, as appellants suggest, and they are not entitled to an order directing the reprocessing of all documents under those new standards. The government cannot be expected to follow an endlessly moving target. With respect to changes in Executive Orders on national security classification, the rule was laid down some years after the sample was submitted: "the Executive order in effect at the time the classifying official acted states the relevant criteria for purposes of determining whether Exemption 1 properly was invoked." *Lesar,* 636 F.2d at 480.[7]

▬ We are more troubled, however, by the degree of *actual* error found in the documents processed in 1975. As amended in February of 1978, the January 1978 Order required the FBI to process only "non-duplicative" documents. Order of Feb. 6, 1978, J.A. at 99. The pages processed in 1975 were thus never reexamined by the FBI, save those seventy-five pages which found their way into the *in*

---

7. We note that Executive Order No. 12,065 has now itself been superseded by Executive Order No. 12,356, 3 C.F.R. 166 (1983).

*camera* sample. In reexamining those seventy-five pages, the FBI determined that nineteen of them had been improperly withheld *under the standards in effect at the time the original withholding decision had been made*. Nineteen mistakes out of seventy-five pages constitutes an error rate of 25%.[8] When coupled with the finding by the district court that the FBI had been "intransigent" in 1975, that error rate is unacceptably high, and suggests to us that many of the documents processed in 1975 were improperly withheld. It seems clear that the documents inventoried in 1975 have never been appropriately processed. The FBI has never been required to reexamine those documents, and only chose to reexamine those pages included in the sample. Therefore, while we affirm the remainder of the grant of summary judgment to the FBI with respect to the validity of the exemptions, we remand to the district court with instructions to order the FBI to reprocess the records withheld under claims of exemptions in 1975, and release those that are non-exempt. The operative standards for disclosure, of course, will be those in effect when the files are reprocessed (although Exemption 1 may still be invoked to withhold documents correctly classified at the time the decision to classify was made). The FBI should be ordered to reexamine not only those documents totally withheld, but those released with partial deletions as well, to determine whether those deletions were proper. The district court had declined to examine the partially deleted documents on the ground that the totally withheld documents would provide an accurate picture of the validity of the deletions as a whole. On that principle, we believe that the error rate of documents totally withheld in 1975 must be understood as calling into question the va-

lidity of all exemptions, total and partial, claimed during that time period and the FBI must therefore conduct a complete reexamination. The FBI also withheld records in 1975 as duplicative or as outside the scope of the request. We do not know whether the error rate as to claimed exemptions casts doubt upon these withholding decisions as well and we remand this issue to the district court for its determination of that question and choice of appropriate procedures, if any are required. After the 1975 documents withheld under claims of exemptions are reprocessed and any disclosable portions released, the district judge may wish to conduct a new *in camera* inspection of a representative sample of those documents to test again the validity of the withholding decisions. That is, of course, a matter within her discretion.

### C.

Throughout the proceedings below, appellants repeatedly sought discovery in the form of depositions of FBI agents, as well as the appointment of a special master to supervise the litigation. In 1976, appellants were permitted to depose two FBI agents; since then, their motions for leave to conduct additional depositions have all been denied. The court below repeatedly declined as well to accede to the repeated requests for the appointment of a special master. Appellants urge that we remand with an order that additional discovery be allowed and a special master be appointed. We decline to do so.

■■■ A district court's refusal to allow discovery will be reversed only upon a finding that the court abused its discretion. No such finding can be made here. Since, as we have held, the record below was

---

8. The government calculates the error rate somewhat differently. Since the government believes that the number of correct decisions includes not only 75% of the documents *withheld* but 100% of the documents *released* as well, it divides 3170 (25% of the number of pages totally or substantially withheld in 1975) by 156,476 (total pages released by the FBI during the course of litigation), and ends up with a 2% error rate. While this method may

be useful in some contexts, it understates the situation with respect to documents withheld. Even if the "overall" error rate is taken to be 2%, we are still left with the implication that one out of four documents withheld in 1975 ought at that time to have been released, at least in part. If this extrapolation proves correct, and, of course, it may or may not, appellants will be entitled to approximately 3170 additional documents.

sufficient to support the grant of summary judgment to the FBI with respect to the adequacy of the search and the validity of the exemptions claimed concerning the documents processed after 1978, there is no reason to permit discovery on those matters.[9] *See Goland*, 607 F.2d at 352 (where affidavits are sufficient, the judge "has discretion to forgo discovery").

Neither do we see any reason to order the appointment of a special master. The decision whether to appoint a master lies within the discretion of the trial court. *Vaughn v. Rosen*, 484 F.2d at 828. Such appointments are "the exception and not the rule," Fed.R.Civ.P. 53(b), and the decision not to name one will "very rarely" constitute an abuse of discretion. 5A J. Moore, *Moore's Federal Practice* ¶ 53.05[3] (2d ed. 1986). We are aware of no FOIA case—and appellants have cited none—in which an appellate court has ordered the appointment of a special master after the district judge decided against it. Indeed, in litigation of this size, the appointment of a special master will often present more problems than it will solve. If the master makes significant decisions without careful review by the trial judge, judicial authority is effectively delegated to an official who has not been appointed pursuant to article III of the Constitution; if the trial judge carefully reviews each decision made by the master, it is doubtful that judicial time or resources will have been conserved to any significant degree. We think the district court acted well within its discretion in maintaining direct personal supervision over this case, and we do not disturb its decision to do so.

### III.

Our review of the grants of summary judgment to the remaining defendants will be much more concise. Appellants have touched upon these orders only casually in their briefs, and not at all during oral argument. Their focus, rather, has been on the FBI. Consequently, we have before us only the sketchiest of grounds on which we are asked to overturn the judgments below. We have reviewed the affidavits submitted in support of and in opposition to the motions for summary judgment, and on the basis of the legal principles we found controlling in Part II, we affirm the granting of those motions.

The remaining defendants had retrieved approximately 13,000 records in 1975. 1984 Memorandum Opinion at 10, J.A. at 130. With the exception of ERDA, these agencies apparently conducted little or no additional searches until 1981, when the parties stipulated to an order defining the scope of the search that would be required of these defendants. The 1981 Order was similar in purpose and structure to the 1978 Order that had applied to the FBI, although the lists of records specified were not identical. In response to the 1981 Order, the CIA retrieved approximately 300 additional records, the Department of Energy located approximately twenty, the Office of the United States Attorney in the Southern District of New York produced two additional files, the Offices of the Attorney General and Deputy Attorney General found six pages, and the Criminal Division of the Department of Justice processed over 100 newly discovered records. *Id.* at 21–25, J.A. at 141–45. Many of the records retrieved had been originally generated by an agency other than that which

9. We note that the series of informal meetings and communications between the parties have served to resolve many of appellants' inquiries and concerns, and many additional records have been turned over as a result. These frequent exchanges have served many of the same functions in this litigation as would depositions. We recognize that appellants would prefer that the FBI agents be subjected to formal questioning under oath, but we do not believe the district court abused its discretion in denying appellants all that they sought. "In national security cases, some sacrifices to the ideals of the full adversary process are inevitable. It is natural that the appellants should seek discovery in the hope that they might turn up details of the government's position that might be turned to the appellant's advantage. In national security cases, however, more detailed information itself may compromise intelligence methods and sources." *Military Audit Project*, 656 F.2d at 751 (footnotes omitted).

discovered them, and those records were referred for processing to the agency responsible for their creation.

Appellants present few specifics in their challenges to the adequacy of these searches. They apparently do not press before us any claims at all with regard to the adequacy of the search conducted by the U.S. Attorney's Office in the Southern District of New York, or by ERDA. Their argument on the remaining searches rests primarily on the inadequacy of the searches those agencies conducted in 1975, a basis we have already rejected as applied to the FBI.

The one specific concern relating to these searches with which we have been presented is the appeal from the district court's denial of appellants' motion to produce records pertaining to Alfred Sarant and Joel Barr. While some such documents have been released, appellants claim that others are unaccounted for. They present no evidence, however, that such documents exist aside from their own description of the activities of these individuals abroad coupled with the assertion that "[i]t is difficult to believe" that the FBI and the CIA do not themselves possess records containing this information. Affidavit of Marshall Perlin (Apr. 18, 1983) at 4, J.A. at 1819. Louis J. Dube, Information Review Officer for the Directorate of Operations of the CIA, has sworn that all relevant files have been searched for information pertaining to Sarant and Barr, Affidavit of Louis Dube, J.A. at 1838–40, and the district court correctly characterized appellants' claim to the contrary as "conjecture." Order of Feb. 29, 1984, J.A. at 118–19.

With regard to the exemptions claimed, we have reviewed the affidavits and accompanying Vaughn indices submitted by the defendants. We find them sufficiently detailed to justify the award of summary judgment, and appellants have presented us with no persuasive argument to the contrary. The district court adopted the same *in camera* procedure to test the validity of the exemptions, and examined a 60-page sample of every hundredth document totally or substantially withheld. Appellants presumably mean to incorporate into their appeal of these orders the reasoning that formed the basis of their challenge to this procedure as applied to the documents withheld by the FBI. We incorporate in response our approval of that procedure. *See* Part II–B *supra*. For substantially the reasons given by the district court, we affirm the grants of summary judgment to the remaining defendants.

## IV.

This litigation has undoubtedly been difficult for all concerned. Appellants have been faced with the challenge confronting all who seek records under FOIA and believe that the government has not been sufficiently forthcoming—the need to demonstrate both the existence of records to which they have no access and the inapplicability of exemptions claimed without the opportunity to view the material exempted. The defendants, particularly the FBI, have been faced with what we expect is the most daunting FOIA request yet made—daunting both because of the volume of records involved and because of the sensitivity of their contents. They have devoted enormous amounts of time and manpower to responding to this request, and as a result have processed and released hundreds of thousands of pages of records dating back through several decades. Judge June Green, throughout the more than eight years during which she presided over this complex litigation, has assiduously sought to fulfill both the appellants' legitimate interest in the documents to which they are legally entitled and the government's legitimate interest in maintaining the secrecy of documents, the disclosure of which would threaten either valid national security concerns or the privacy interests of third parties. The careful and conscientious attention she has given this difficult case is evident from the record.

Because questions remain about whether appellants have received all that the law requires be given them among the records searched by the FBI before 1978, we re-

mand to the district court with instructions that these records, both those totally withheld and those released with deletions, be reprocessed by the FBI under current disclosure standards. In all other respects, we affirm the orders of the district court: the grant of partial summary judgment to the FBI with respect to the adequacy of its search, the grant of summary judgment to the FBI with respect to the validity of the exemptions claimed for documents processed after 1978, the grant of summary judgment to the remaining defendant agencies, and the denial of appellants' motion to order the production of further documents pertaining to Sarant and Barr.

*It is so ordered.*