# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| ERIC HOOD, | No. 56213-8-II |
| Appellant, | |
| v. | |
| CENTRALIA COLLEGE, | UNPUBLISHED OPINION |
| Respondent. | |

LEE, J. — Eric Hood appeals the superior court's dismissal with prejudice of his October 2020 lawsuit brought under the Public Records Act (PRA), ch. 42.56 RCW, against Centralia College (College). Hood claims that the College violated the PRA because it withheld responsive records pertaining to the College's 2018 financial audit. Hood requests attorney fees and costs as the prevailing party.

We hold that the College did not violate the PRA by withholding documents responsive to Hood's request. Rather, the College reasonably interpreted Hood's PRA request after seeking clarification and conducted an adequate search for responsive documents. Therefore, we affirm the superior court. We also deny Hood's request for attorney fees and costs.

## FACTS

### A. SEPTEMBER 23 PUBLIC RECORDS REQUEST

On September 23, 2019, Eric Hood emailed the College a public records request for records pertaining to a recent audit, stating:

No. 56213-8-II

> I learned that your organization was recently audited by the state auditor. May I have all records it got from the auditor and all records of any response to the audit or to the audit report?[1]

Clerk's Papers (CP) at 64. The College's public records officer, Julie Huss, responded that same day and requested clarification, stating:

> We are in receipt of your public records request below. Please let this email serve as acknowledgement of your request and our five-day response under RCW 42.56.
>
> I am seeking some clarification on your request. Are you referring to the Financial Audit for 2018?

CP at 64. Hood confirmed that his request referred to the 2018 financial audit.

Although Hood clarified that his request pertained to the 2018 financial audit, Huss still "found Mr. Hood's request to be unclear, as it requested documents received from the auditor and the College's 'response to the audit,' which [she] found to be ambiguous." CP at 230. Huss spoke with fellow employees and, therefore, "knew that the College issued formal responses to State Auditor's Office (SAO) audit management letters, and so [she] believed records surrounding the formal and informal response to the audit report and management letter were what Mr. Hood was seeking." CP at 230.

Huss conducted a public records search in which she first identified specific employees with information responsive to Hood's request. She contacted Marla Miller, director of financial services "who manages the administration of audits from the College side," which includes "overseeing communications with the SAO, supervising the production of documents and information to SAO, regularly updating management on the progress, and reviewing the results of

---

[1] The "state auditor" here is the State Auditor's Office (SAO). And the "audit report" is the SAO Audit Report No. 1023438.

2

the audit with SAO, and coordinating any response on behalf of the College." CP at 207-08. Huss also contacted Andrea Schierman, an accountant who managed the College's financial statements and provided documents to the SAO for review.[2] Huss worked with Miller and Schierman to identify responsive records, which included "all documents . . . related to the College's response to the audit report and management letter." CP at 208. The employees looked through "their physical and electronic files for responsive records," and Miller and Schierman "consulted with [Huss] during the search process." CP at 231. Miller "turned over a number of records from the audit as well as several emails." CP at 231. Schierman "determined that she did not have responsive e-mail records beyond copies of records already provided by Ms. Miller. In addition, she provided some records available on the College website and College shared drives." CP at 231. Huss determined that she had identified and collected all responsive records.

On October 8, 2019, Huss responded to Hood with links to the SAO Audit Report No. 1023438. She also stated:

> Your request is a little big [sic] ambiguous. I have interpreted it to mean you are asking for the [SAO] Audit Report [No. 1023438] (attached/ linked above), the management letter issued by the state auditor's office, and emails in response to the management letter. The cost for the documents not included in this email is $1.80. f [sic] this is not what you are requesting, please let me know.

CP at 63. That same day, Hood wrote that he was unsure what was ambiguous with regard to his email. He repeated his original records request, asking, "Are the documents you mentioned the only ones you received from the auditor? And do you have any responses to the audit or the audit report?" CP at 63.

---

[2] Schierman's employment at the College ended on October 15, 2019 before litigation commenced.

No. 56213-8-II

Huss responded and described documents that she believed responsive and that she had

assembled, stating:

> There is an email with a draft management letter attached. There is an email string
> about the draft management letter talking about the items in the draft and scheduling
> the exit interview from the audit and the final management letter. These are the
> documents that make up that $1.80 cost.

> At the start of the audit process, the auditor sends an engagement letter which
> initiates the audit process. I believe there are emails about scheduling meetings for
> the auditors to do the audit process. I don't have a count as to how many documents
> fall into this category yet.

> I am trying to frame search parameters based on what I understand you are asking
> for and see what is responsive.

CP at 62-63. On October 9, Hood responded:

> Thanks for the info. I am most interested in records showing the City's [sic]
> response to the audit. Since I don't know what [sic] how it responded, I don't know
> how I can be clearer.

CP at 62. Huss then emailed:

> Sounds good. The management letter and the emails back and forth about the
> management letter are in that $1.80 bundle.

CP at 62. Hood wrote:

> Will you email me that bundle after I send you a check for $1.80, or can I somehow
> pay via credit card or paypal?

CP at 62. On November 4, Huss responded:

> Please see the attached documents.

CP at 62. The responsive documents that Huss produced included drafts of the management letter;

an email chain between the SAO and the College employees concerning the draft management

4

letter; the management letter, dated March 7, 2019; and the SAO Audit Report No. 1023438, published March 21, 2019.

Hood paid the required fees and the College provided the records Huss had described. The College received no further communication from Hood until almost a year later in October 2020, when Hood filed his complaint.

B.    BACKGROUND—2018 FINANCIAL AUDIT

Hood's public records request related to the SAO Audit Report No. 1023438. The SAO Audit Report No. 1023438 was produced after an audit of the College's 2018 financial statements from July 1, 2017 through June 30, 2018. The SAO determined that the College had mislabeled three items on its financial statements.

The specific error at issue "resulted in errors of paired overstated and understated values on the College's Financial Statements." CP at 208. The "net effect of these errors was zero actual dollars." CP at 209. The College objected to the issuance of a management letter because the effect of the errors resulted in a zero net effect and was already corrected. However, the SAO decided to issue a management letter, finding that the mislabeling of the amounts of money was important.

The resolution for the error is addressed in the SAO Audit Report No. 1023438. Because the error was corrected during the course of the audit and corrected by listing the items in their appropriate category, no other response was required from the College's administration or the Board of Trustees (Board).

Minutes from a Board meeting show that board member Jim Lowery attended the SAO's exit conference for the College's audit. The minutes state that Lowery described the audit as

"clean, with just some minor management notes." CP at 171. The minutes made no further note of the audit.

## C. LAWSUIT FOR ALLEGED VIOLATIONS

On October 29, 2020, Hood filed this lawsuit against Central College for alleged violations under the PRA. Hood alleged that his request "encompassed records other than the records [the College] provided him." CP at 4.

In Hood's interrogatories and request for production of documents sent to the College during discovery, Hood requested "all records *related* to the State Auditor's Office audit of the College which resulted in Report No. 1023438 that have not been previously produced, whether or not the College considers them responsive to Plaintiff's Request." CP at 120-21 (emphasis added). In a discovery conference, Hood then requested "any specific query from the auditor and any response to that query." CP at 82. In response to the discovery requests, the College conducted a "server search," which consisted of "perform[ing] a broad search for all emails between the State Auditor's Office (SAO) and the College from the beginning of September 2018, prior to the initiation of the audit, through mid-March 2019 when the audit was closed." CP at 226. The search resulted in the following:

> 574 email messages with various subjects; some relating to the audit and many regarding subjects that were not related to the audit. These e-mails and attachments comprised of over 2,500 pages, including 800 pages of spreadsheets of information provided to SAO concerning other business between the College and SAO.

CP at 226.

Documents produced in response to Hood's discovery requests included documents in response to Hood's request for records from the SAO to the College "from the date the College

6

was first notified by the SAO that it would conduct the audit resulting in SAO Report NO. 1023438

up to and including the date of its last response to the audit or audit report." CP at 144. Responsive

documents, during the above time period, included communications from the SAO to the College

in which the SAO requested a response, responses from the College to SAO communications, and

records related to the cost of the audit.

A server search conducted by the College revealed an e-mail from Schierman to the SAO

that the College had not previously produced to Hood, and which was part of a longer email chain

between the College and the SAO. The College agreed that the e-mail from Schierman was

responsive to Hood's PRA request.

During discovery, the College sent Hood interrogatories relevant to public records requests

that Hood had supposedly made to other agencies.

> INTERROGATORY NO. 6: From how many public agencies other than Centralia College have you made a request, concerning an audit of that public agency by the State Auditor's Office, for "all records of any response to the audit or to the audit report."
>
> . . . .
>
> INTERROGATORY NO. 7: Please identify all the public agencies from whom you have made a request for public records of "any response to the audit or to the audit report."
>
> . . . .
>
> INTERROGATORY NO. 8: Of the agencies identified in response to Interrogatory No. 7 above, how many sought clarification of your request?
>
> . . . .
>
> INTERROGATORY NO. 9: Of the agencies identified in response to Interrogatory number 7, against how many have you filed a public records lawsuit?

. . . .

> INTERROGATORY NO. 10:    Of the agencies identified in response to Interrogatory number 9, how many were determined by a court of law to have violated the Public Records Act?

CP at 23-25.

On February 22, 2021, Hood moved for protection from the College's interrogatories numbers 6-10. He argued that other PRA requests were not relevant to whether the College properly responded to his discovery request and were not reasonably calculated to lead to the discovery of admissible evidence. He contended that "the College cannot justify how the *number* of Hood's requests, requests for clarification, lawsuits or court decisions involving other agencies could possibly affect its duty to respond or how it responded to Hood's PRA request." CP at 17 (emphasis in original).

The College responded that Hood failed to show good cause regarding why the court should grant his motion. It contended that under CR 26(b)(1), discovery may be obtained regarding any matter that is not privileged provided it is relevant to the pending action. The College argued that Hood failed to show that the order of protection should be granted because Hood "has shown no specific prejudice or harm and has used no affidavits, nor has he given concrete examples of harm. Mr. Hood's only argument is that the requested information is not relevant." CP at 38. The College contended that it believed Hood to be a sophisticated requester who has "made the same request to many government agencies; and, further, that Mr. Hood has sued many public agencies after making the same, or similar, requests, with similar lack of detail about what he was seeking." CP at 40. The College argued that it believed that Hood purposefully remained ambiguous and had engaged "in a pattern of unhelpful, ambiguous, and calculated

requests to ensure that Mr. Hood could maintain an argument that the recipients of his requests failed to produce all documents he requested." CP at 40. Finally, the College argued that the interrogatories were relevant to factors outlined in *Yousoufian v. Office of Ron Sims*,[3] specifically, "because the requested information is relevant to the clarity of the request, to the reasonableness of the College's response, the reasonableness of any explanation for noncompliance, and also to the level of penalty that may be necessary to deter future noncompliance." CP at 42.

On March 19, 2021, at a hearing on the motion for an order of protection, Hood contended that "judicial review of a PRA case involves solely an agency's response to a public records request." Verbatim Report of Proceedings (VRP) at 6. He contended that requests made to other agencies lacked relevance to whether the College properly responded to his PRA request.

The College responded that Hood failed to show actual harm or prejudice. Further, the College argued that "if this same request was going out to a number of other state agencies, then the language that is used in that request or in other similar requests gives insight into the actual intended meaning of plaintiff's request to Centralia College at the time it was made." VRP at 9. The College elaborated, "And so because we have this potential data set here of very similar requests going out to a number of state agencies, there is a lot of information here that we could use to assess to determine whether or not the public records officer's response was reasonable." VRP at 12. The College contended that even if irrelevant, "we would still be able to have access to information about the language of those requests because we can use that as impeachment

---

[3] 168 Wn.2d 444, 229 P.3d 735 (2010).

evidence when discussing the potential—the actual meaning of Mr. Hood's request to Centralia College." VRP at 9.

The superior court denied the protection order after consideration of the pleadings and files in the case. The court ordered Hood to respond to the interrogatories.

In the College's interrogatory number 11, the College asked Hood to "[p]lease describe the full scope of what categories or kinds of records you consider to be encompassed in the phrase, 'response to the audit.'" CP at 318. Hood responded that the question required him to speculate on the types of categories or records in the College's possession. However, he responded by outlining a document found on the SAO website, "Anatomy of an Audit,"[4] stating:

> Without waiver of objection, a response to a request for "all records of any response to the audit or to the audit report" would encompass any "reply or reaction" (the common meaning of "response" to the audit or the audit report. According to the SAO ([sic] at https://sao.wa.gov/about-audits/anatomy-of-an-audit-text-version/), an audit involves the following:
>
> I.      Make A Plan
> The pre-audit phase confirms the audit's scope, sets objectives and maps the path forward.
> II.     Collect Data
> Auditors conduct background research and interviews, gather data, validate evidence and determine what's important to the scope, and what isn't.
> III.    Analyze Results
> The auditor evaluates the information against the audit's objectives to determine if the government or agency is operating as it should.
> IV.     Audit Report
> Audit reports can be less than 10 pages or more than 100 pages, depending on what government is being audited and the type of audit performed. Most, however, have information in common:

---

[4] *Anatomy of an Audit (Text Version)*, OFF. OF WASH. STATE AUDITOR, https://sao.wa.gov/about-audits/anatomy-of-an-audit-text-version/ [https://perma.cc/QA2H-WVQP].

> A title page tells you what kind of audit was done and what government was audited. Because most audits look at financial records for a specific time, like two calendar years, the title page will also tell you the audit period.
> A transmittal letter, signed by the State Auditor is almost always included. This shows that we told the leaders of the government about our findings. Audit results can be quite short if auditors found that a government's finances were properly accounted for. This section will tell you what areas of the government's operations we examined.
> V. Findings
> When auditors have significant concerns about a government's control over public resources or other issues, this is called a "finding." They explain what the issue was, and what effect it could have on public resources.
> VI. Recommendations
> If there were audit findings, the auditors will also make suggestions about how the government can fix the issue in the future.

> Some or all of the actions described by the SAO involve records in the possession of the College that are responsive to Plaintiff's Request which it nonetheless withheld.

CP at 318-19.

D.    HEARING ON THE MERITS[5]

Hood submitted a brief on the merits in which he contended that the College had withheld records responsive to his public records request. Hood argued that "[t]he sole clarification sought by the College in response to Hood's PRA request was to determine which audit report Hood's request referred to." CP at 193. Hood pointed to the 1,737 pages of records produced by the College during discovery to show that the College had received many more documents "from the SAO or provided to the SAO in response to the audit or audit report, including emails and invoices,

---

[5]  The College states that it moved for summary judgment but provides no citation to the record. It also states that the "superior court granted summary judgment in favor of the College, holding that it met its PRA obligations." Br. of Resp't at 10. The superior court's final order makes no mention of CR 56 and does not reference summary judgment. The transcript of the superior court's oral ruling also makes no mention of CR 56 or summary judgment.

all dated during the pendency of the audit referenced by Hood's PRA request" than it produced. CP at 194.

The College responded that Hood had made an ambiguous public records request and that the College had responded to the part of the request that was clear. The College argued that Hood never stated in his communications with Huss that he sought records beyond those that Huss identified. The College also argued that it "conducted a search reasonably calculated to produce all records responsive to the clear portions of Mr. Hood's request." CP at 212. The College admitted that during discovery in the litigation it had discovered a single record responsive to Hood's PRA request, an email from Schierman. However, the College argued that the discovery of a single responsive email not previously found did not demonstrate a violation of the PRA.

The College filed the declarations of Huss and Miller along with its brief on the merits. Huss declared that she attempted to "define the portions of [Hood's] request that [she] understood and asked for additional feedback to frame the scope of [her] search." CP at 230. Based on Hood's request, Huss determined that he sought "the formal and informal response to the audit report and management letter." CP at 230. She stated that Hood's "reply did not clarify what specific records he was seeking, so [she] moved forward with responding to the portions of the request [she] found to be unambiguous." CP at 230. Huss explained that Hood had stated he was most interested in the College's "'response to the audit,' which [she] understood to mean the College's response to the audit report, which would be found in the audit report itself, and the College's financial statements, which contain the items addressed in the audit report." CP at 230. Huss did not conduct a "College-wide electronic search." CP at 231.

Miller similarly declared that Hood's request "[b]ased on his indications" included "all of the records and communications surrounding the College's informal and formal responses to the management letter, as well as the audit report itself." CP at 208. Miller detailed her search, stating that she "looked through [her] email inbox, electronic calendar items, hard copy files, as well as shared and personal electronic folders. [She] consulted with Ms. Huss over the course of [her] search." CP at 208. Miller "gathered all documents that [she] could find that related to the College's response to the audit report and management letter and provided them to Ms. Huss." CP at 208. Miller stated that she and Schierman consulted during their searches and determined that "[b]ecause [Miller] had been included on [Schierman's] communications with SAO and participated in meetings with SAO regarding the audit report, there appeared to be a complete overlap between [Schierman's] documents and the documents [Miller] had identified in [her] search." CP at 208.

The superior court found in favor of the College and dismissed Hood's lawsuit with prejudice, ruling that the College did not violate the PRA. Hood challenges the following conclusions of law on appeal:

> 2. [Hood] identified and described documents with sufficient clarity to constitute a valid request for public records but the scope of his unchanged request, which the College tried to determine, was open to subjective interpretation. Although the College could have been more clear, the College sought clarification by describing the documents it had searched for and asking [Hood] to indicate if he wanted additional documents, but [Hood] did not follow up with specifics.

> 3. Based on the College's communications with [Hood], the College reasonably understood [Hood] to be seeking the records it described to him on October 8, 2019, and later provided, including the College's informal and formal response to the audit report and management letter. The College's search was therefore reasonably calculated to identify all responsive records, and adequate under the Public Records Act.

4.       [Hood] is not entitled to penalties under RCW 42.56.550(4), as no denial or withholding of records has taken place.

CP at 337.

Hood moved for reconsideration, which the superior court denied. Hood appeals.

## ANALYSIS

### A.   LEGAL PRINCIPLES

We apply de novo review to an agency action challenged under the PRA. RCW 42.56.550(3). "'[W]here the record consists only of affidavits, memoranda of law, and other documentary evidence,' we stand in the same position as the trial court." *John Doe G v. Dep't of Corr.*, 190 Wn.2d 185, 191, 410 P.3d 1156 (2018) (quoting *Progressive Animal Welfare Soc'y v. Univ. of Wash*, 125 Wn.2d 243, 252, 884 P.2d 592 (1994) (plurality opinion)).

The PRA requires that "[e]ach agency, in accordance with published rules, shall make available for public inspection and copying all public records, unless the record falls within specific exemptions of . . . this chapter, or other statute which exempts or prohibits disclosure of specific information or records." RCW 42.56.070(1). Pursuant to the PRA, "[c]ourts shall take into account the policy . . . that free and open examination of public records is in the public interest, even though such examination may cause inconvenience or embarrassment to public officials." RCW 46.56.550(3). We construe the PRA's disclosure provisions liberally and exemptions narrowly. *John Doe G*, 190 Wn.2d at 191-92. "The legislature enacted the PRA to ensure 'broad disclosure of public records.'" *Id*. at 192 (quoting *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 127, 580 P.2d 246 (1978)).

A party seeking a public record must "at a minimum, provide notice that the request is made pursuant to the [PRA] and identify the documents with reasonable clarity to allow the agency to locate them." *Hangartner v. City of Seattle*, 151 Wn.2d 439, 447, 90 P.3d 26 (2004).

B.      THE COLLEGE'S COMPLIANCE WITH THE PRA

         1.       Hood's September 23 Public Records Request

Hood argues that his public records request required no clarification once he informed Huss that he sought records pertaining to the 2018 financial audit. He also argues that Huss never sought clarification and improperly narrowed his request. We disagree.

> A public records request must be for identifiable records. A request for all or substantially all records prepared, owned, used, or retained by an agency is not a valid request for identifiable records under this chapter, provided that a request for all records regarding a particular topic or containing a particular keyword or name shall not be considered a request for all of an agency's records.

RCW 42.56.080(1).

A record is identifiable when the requester gives "'a reasonable description enabling the government employee to locate the requested records.'" *Bonamy v. City of Seattle*, 92 Wn. App. 403, 410, 960 P.2d 447 (1998) (quoting *Bristol-Myers Co. v. F.T.C.*, 138 U.S. App. D.C. 22, 424 F.2d 935, 938, *cert. denied*, 400 U.S. 824 (1970)), *review denied*, 137 Wn.2d 1012 (1999); *Zink v. City of Mesa*, 162 Wn. App. 688, 711, 256 P.3d 384 (2011), *review denied*, 173 Wn.2d 1010 (2012).

In *Wood v. Lowe*, the requester specified categories of records sought, including "any other information or documentation that you may have in your custody or under your control that relates to Ms. Wood and her past and current employment with your office and the Prosecutor's Office in general." 102 Wn. App. 872, 875, 10 P.3d 494 (2000). On appeal, the court held that the request

for "information" was not for an identifiable public record. *Id*. at 879. The court also held that the request for "documentation" pertaining to Wood's employment, "lack[ed] any meaningful description helpful for the person charged with finding the record." *Id*. The court concluded that "[c]onsequently, both requests fall outside of the [PRA]." *Id*.

Hood requested "all records [the College] got from the auditor" and "all records of any response to the audit or to the audit report." CP at 64. After inquiry, Hood later clarified that his request pertained to the College's financial audit for 2018. Based on this, Hood argues that his request was not ambiguous and, pursuant to his request, he claims he clearly sought three types of records, including:

- "[A]ll communications the College received from the SAO,"
- "[A]ll College responses to SAO communications including SAO requests for information or documents during the audit process," and
- "[A]ll internal or external records showing the College's response to the audit or audit report."

Br. of Appellant at 22. Hood contends that, because his request pertained to the financial audit for 2018, he informed the College of the specific subject matter for the records he sought. According to Hood, the time period for which he sought records would therefore flow from the subject matter. In other words, the relevant time period would be from the time that the SAO communicated to the College that an audit would commence until the College completed responding to the audit.

We agree that Hood made a request for identifiable records. He requested records that related to the 2018 financial audit, and this was a valid request for records pertaining to a specific topic. However, Hood's request was ambiguous. As in *Wood*, Hood requested records pertaining to a specific topic—the 2018 financial audit. However, the description provided no assistance to the College in locating the records.

16

Hood's request left the door open for multiple interpretations. For example, looking to the language of his request, "all records it got from the auditor" does not appear to relate to the 2018 financial audit and the request provides no meaningful description to assist Huss in locating the records sought. Similarly, "all records of any response to the audit or audit report" in the context of the 2018 financial audit could reasonably be interpreted to mean records of a response to the completed audit, as Huss interpreted the request based on Hood's response to her inquiries. Hood relies on an "Anatomy of an Audit," a document that he produced in response to the College's interrogatory number 11 during litigation to support the assertion that an audit is a process, and thus, responses to that process would include all responses from the College during the entirety of the audit, not only documents produced once an audit is complete. Therefore, according to Hood, he should have received records from the "pre-audit phase" and the period in which the SAO collects data and gathers background information to determine the scope of an audit. Br. of Appellant at 31. Hood contends that responsive documents to his clear request included any records pertaining to the "audit process" and the audit report. Br. of Appellant at 22. These arguments underscore the ambiguity present in his request because they support that his request could be interpreted in more than one way, just as he has interpreted the request in multiple ways. Looking to the plain language of the request, the request was ambiguous and failed to provide assistance to Huss in searching for and locating responsive records.

2. Request For Clarification

Hood argues that the College, after confirming that Hood's request pertained to the 2018 financial audit, never requested further clarification of his request for public records. He also

contends that it was not his responsibility to provide clarification relative to documents that were not in his possession and of which he was unaware. We disagree.

RCW 42.56.520(3)(a) and (b), provide:

> In acknowledging receipt of a public record request that is unclear, an agency . . . may ask the requestor to clarify what information the requestor is seeking.
>   . . . If the requestor fails to respond to an agency request to clarify the request, and the entire request is unclear, the agency . . . need not respond to it. Otherwise, the agency must respond, pursuant to this section, to those portions of the request that are clear.

WAC 44-14-04003(8) provides:

> An agency may seek clarification of an "unclear" or partially unclear request. RCW 42.56.520. An agency can only seek a clarification when the request is objectively "unclear." Seeking a "clarification" of an objectively clear request delays access to public records.
>   If the requestor fails to clarify an entirely unclear request, the agency need not respond to it further. RCW 42.56.520. However, an agency must respond to those parts of a request that are clear.

An agency that is "unclear about what was requested . . . [is] *required* to seek clarification." *Neigh. All. of Spokane County v. Spokane County*, 172 Wn.2d 702, 727, 261 P.3d 119 (2011) (emphasis added).

Here, the record supports the College's request for clarification of the records Hood sought. Huss informed Hood that she found his request ambiguous. Huss informed him what she was "interpret[ing] [the request] to mean" and described documents that she believed responsive, including the SAO Audit Report No. 1023438, management letter issued by the SAO, and emails in response to the management letter. CP at 63. Huss asked Hood to inform her if these were not documents that he was requesting. Hood responded by restating his original PRA request:

> Are the documents you mentioned the only ones *you received from the auditor*? And do you have *any responses to the audit or the audit report*?

CP at 63 (emphasis added). Huss responded by informing Hood that she persisted in attempting to frame relevant search parameters and she described the documents that she had found in response and further described additional documents including ones that were relevant to the "start of the audit process" such as an engagement letter and scheduling emails. CP at 63. Hood did not confirm that he sought the documents from the initiation of the audit process. Instead, he stated:

> Thanks for the info. I am most interested in records showing the City's [sic] response to the audit. Since I don't know what [sic] how it responded, I don't know how I can be clearer.

CP at 62.

On appeal, Hood argues that his "request obviously encompassed the College's description of the Engagement Letter and Scheduling Emails," and his response that he was "most interested" did not signify that he did not want the scheduling emails and engagement letter as he never used the terms "solely 'interested.'" Br. of Appellant at 26-27. He also contends that he could not determine whether "*undescribed* 'additional documents' were responsive to his request." Br. of Appellant at 27 (emphasis in original).

The PRA does not "require public agencies to be mind readers." *Bonamy*, 92 Wn. App. at 409. In context, the email exchanges show that Huss described documents she had gathered and further described additional documents relevant to a different portion of the audit process in order to inquire if Hood sought those documents. Huss informed Hood that she was attempting to set the parameters of his request. Hood never confirmed that he sought documents of the type or from the time that Huss described. Instead, Hood responded generally, stating that he was "most interested in records showing the City's [sic] response to the audit." CP at 62. Based on Hood's

response, Huss could reasonably conclude that Hood did not seek the documents she had described. Therefore, Huss reasonably concluded based on her communications with Hood that "responsive records were all of the records and communications surrounding the College's informal and formal responses to the management letter, as well as the audit report itself." CP at 208. Also, Huss was not provided any clarification in the part of Hood's request she found ambiguous. Huss, therefore, responded t portion that she believed was clear. Given the ambiguity of Hood's initial request and his communications in response to Huss's request for clarification, Huss' response and interpretation of the request was reasonable.

> 3. Failure To Provide A Response Date

Hood next argues that the College's response violated the PRA because the College never provided an estimate of the time in which it would respond to its request for clarification. The College acknowledges that it failed to provide a response date but contends that it had remedied this violation by the time Hood brought suit. We agree with the College that any violation was subsequently remedied by the College.

The PRA requires an agency that requests clarification must "[a]cknowledg[e] that the agency . . . has received the request and . . . provid[e], to the greatest extent possible, a reasonable estimate of the time the agency . . . will [be] require[d] to respond to the request if it is not clarified." RCW 42.56.520(1)(d).

Here, the College received Hood's September 23, 2019 request for public records and responded the same day by seeking clarification as to whether his request pertained to the financial audit for 2018. The College did not inform Hood of the time it would require to respond if the request was not clarified. Nonetheless, when

an agency diligently makes every reasonable effort to comply with a requester's public records request, and the agency has fully remedied any alleged violation of the PRA at the time the requester has a cause of action (i.e., when the agency has taken final action and denied the requested records), there is no violation entitling the requester to penalties or fees.

*Hobbs v. Wash. State Auditor's Office*, 183 Wn. App. 925, 940-41, 335 P.3d 1004 (2014). Here, the College's failure to inform Hood of the time it would require to respond if the request was not clarified was remedied two weeks later.

On October 8, based on Hood's response to her inquiries, Huss sent an email with responsive documents. Thus, any failure to provide a time estimate for disclosure was timely remedied.

### 4. Adequacy Of Search

Hood argues that even if the trial court correctly interpreted Hood's request, the College still failed to conduct an adequate search. Hood contends that the College's search was inadequate because it subsequently disclosed documents during discovery that were responsive to his request. Thus, he asserts that the College failed to search in "all reasonable locations where 'formal and informal responses'" would be located. Br. of Appellant at 61.

The failure to locate and produce a responsive record is not a per se violation of the PRA. *See Block v. City of Gold Bar*, 189 Wn. App. 262, 278-79, 355 P.3d 266 (2015), *review denied*, 184 Wn.2d 1037 (2016). In determining whether a search was adequate, "the focus of the inquiry is not whether responsive documents do in fact exist, but whether the search itself was adequate." *Neigh. All. of Spokane County*, 172 Wn.2d at 719-20.

A search is adequate if it is "reasonably calculated to uncover all relevant documents." *Id.* at 720. What is a reasonable search depends on "the circumstances of a case." *Id.* "When

examining the circumstances of a case, then, the issue of whether the search was reasonably calculated and therefore adequate is separate from whether additional responsive documents exist but are not found." *Id*. "'[A] search need not be perfect, only adequate.'" *Id*. (quoting *Meeropol v. Meese*, 252 U.S. App. D.C. 381, 395, 790 F.2d 942 (1986)). "[A]gencies are required to make more than a perfunctory search and to follow obvious leads as they are uncovered." *Id*. The

> "agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested." This is not to say, of course, that an agency must search *every* possible place a record may conceivably be stored, but only those places where it is *reasonably likely* to be found.

*Id*. (emphasis in original) (quoting *Oglesby v. U.S. Dep't of Army*, 287 U.S. App. D.C. 126, 920 F.2d 57, 68 (1990)).

An agency bears the burden of showing that it performed an adequate search beyond a material doubt. *Id*. at 721. "To do so, the agency may rely on reasonably detailed, nonconclusory affidavits submitted in good faith. These should include the search terms and the type of search performed, and they should establish that all places likely to contain responsive materials were searched." *Id*. at 721. "[S]peculative claims about the existence and discoverability of other documents will not overcome an agency affidavit, which is accorded a presumption of good faith." *Forbes v. City of Gold Bar*, 171 Wn. App. 857, 867, 288 P.3d 384 (2012), *review denied*, 177 Wn.2d 1002 (2013).

Here, the College's search was reasonably calculated to find responsive records. Huss interpreted Hood's request to be for "the formal and informal response to the audit report and management letter." CP at 230. Her search was specifically oriented to find documents responsive to that request. Huss detailed the search she undertook. Huss stated that she contacted the two

employees whom she believed were implicated by the request: the director of financial services, Miller, who managed the administration of audits, and the accountant for the College, Schierman, who was responsible for providing documents for SAO review. Huss worked with Miller and Schierman throughout the search process. She asked the employees to search their physical and electronic files for responsive documents. She concluded that a college-wide electronic search was unnecessary because the specific nature of the request was limited to a 2018 financial audit.

Miller also detailed the search she conducted at Huss's request, stating that she "looked through [her] email inbox, electronic calendar items, hard copy files, as well as shared and personal electronic folders. [She] consulted with Ms. Huss over the course of [her] search." CP at 208. Miller "gathered all documents that [she] could find that related to the College's response to the audit report and management letter and provided them to Ms. Huss." CP at 208. Miller's declaration shows that Schierman also conducted a search as Huss, Miller, and Schierman consulted with each other as they conducted their searches, and they determined that "[b]ecause [Miller] had been included on [Schierman's] communications with SAO and participated in meetings with SAO regarding the audit report, there appeared to be a complete overlap between [Schierman's] documents and the documents [Miller] had identified in [her] search." CP at 208.

Although the College provided declarations detailing its search and the reasons for its parameters, Hood contends that the search was not reasonably calculated as shown by documents not produced by the College when he made his records request. Hood argues the search was inadequate because (1) the College did not initially search the email server which contained an email from Schierman, which the College admitted was responsive to the records request; (2) the College excluded from its search formal or informal responses to the audit report that occurred

after discussion of the management letter, "for example, the College Board's discussion of the audit[;]" (3) the College failed to search all files of any employees involved in the audit when the record showed that they received emails from the SAO or may have responded to the audit; and (4) the College failed to search its Board's files for any minutes that would constitute a response to the audit. Br. of Appellant at 62.

a.      The Schierman email

The College admits that a single email from Schierman was responsive to Hood's records request and not produced until discovery. However, the College contends that failure to produce a single record "due to circumstance[s] that kept the agency from finding the record does not establish a violation of the PRA." Br. of Resp't at 28.[6]

The failure to give a single responsive record does not constitute a violation of the PRA when an adequate search is performed. *See Kleven v. City of Des Moines*, 111 Wn. App. 284, 296-97, 44 P.3d 887 (2002) (holding no violation of the PRA for failure to produce a mislabeled tape when on discovery of the mistake the City promptly produced it and corrected its misrepresentations to the court).

Here, the College produced an email chain in response to Hood's records request after asking both Miller and Schierman to search for responsive electronic records. A single e-mail at the end of this e-mail chain from Schierman was not produced. The email was later found on the server that "hosts files stored in College email inboxes and in the email inbox of Andrea

---

[6] The record lacks an affidavit from Schierman attesting to her search, and it therefore is unclear why the email was missed. Huss's and Miller's declarations, however, indicates that all employees searched their electronic communications, including emails.

Schierman." CP at 180. Hood argues that the College's failure to search its email server when he sent his request shows that its search was inadequate because the College failed to search all reasonable places where responsive documents could be found. However, the College's search encompassed the electronic records of Miller and Schierman. The fact that the Schierman email was later found on the server does not show that the College's search was inadequate. Both Miller and Schierman looked through their electronic records and the search was reasonably calculated to discover any emails relevant to the request as shown by the earlier discovery of the rest of the email chain.

b.      Other formal or informal responses

Hood also argues that the College's search should have included other formal or informal responses to the audit. This included discussion of the management letter and the files of any employees involved in the audit who received emails from the SAO.

Here, the parameters of Hood's request as the College understood it based on Hood's responses to further inquiry encompassed responses to the SAO Audit Report No. 1023438 and management letter. As detailed by Huss, the College's search was reasonably calculated to discover responsive documents based on that understanding. The communications between the College employees and the SAO cited by Hood show that the SAO requested documentation and asked questions when conducting the audit. However, these documents are reasonably understood not to be responsive to the College's understanding that Hood sought responses to the SAO Audit Report No. 1023438 and management letter.

c.  Board minutes

Hood argues that the College failed to search Board records for minutes responding to the audit as these would have "constituted either (or both) a formal or informal response to the audit report." Br. of Appellant at 65. We disagree.

Miller stated in her declaration that no response to the audit was required from the Board relevant to the audit because any error was corrected during the audit process. The record does not show that the Board responded to the SAO Audit Report No. 1023438. Board minutes after the audit exit conference showed that board member Lowery had attended the conference and stated at the Board meeting that "the audit was clean, with just some minor management notes." CP at 171. Based on the evidence in the record, the decision to not include minutes from the Board is reasonable as no response by the Board to the audit was required nor made.

The College's search, based on Huss's understanding of the request after seeking clarification from Hood, was reasonably calculated to find documents responsive to his request. Huss explained what she understood the parameters of the search entailed and why she worked specifically with the employees that she did. Because the search was adequate based on the circumstances of this case, the College's search was adequate under the PRA.

C.  DISCOVERY RELATING TO HOOD'S PUBLIC RECORDS REQUESTS FROM OTHER COLLEGES

Hood argues that the College's speculation of Hood's motives for requesting public records prejudiced the superior court. The College responds that the discovery was relevant to "shed light on the scope and meaning of Mr. Hood's request, as well as show how other agencies responded to those requests." Br. of Resp't at 30. The College argues that Hood fails to show that the superior

court's discovery order was erroneous or that the superior court relied on Hood's history of requests or his motivation when issuing its ruling.

We review a superior court's discovery orders under an abuse of discretion standard. *Cedell v. Farms Ins. Co. of Wash.*, 176 Wn.2d 686, 694, 295 P.3d 239 (2013). We will reverse a discovery order on a clear showing that its decision was "'manifestly unreasonable, exercised on untenable grounds, or for untenable reasons." *Id*. (internal quotation marks omitted) (quoting *T.S. v. Boy Scouts of Am.*, 157 Wn.2d 416, 423, 138 P.3d 1053 (2006)). This exercise of discretion "will not be interfered with by an appellate court unless there has been an abuse of discretion which caused prejudice to a party or person." *Doe v. Puget Sound Blood* Center, 117 Wn.2d 772, 777, 819 P.2d 370 (1991); *see Bersen v. Big Bend Elec. Co-op., Inc.*, 68 Wn. App. 427, 436, 842 P.2d 1047 (1993) (holding that permitting testimony of witnesses not identified in pretrial discovery was an abuse of discretion, however, the evidence "was [not] relied on by the trial court in reaching its decision" and therefore, "[a]ny error was harmless.").

"Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." CR 26(b)(1). The discovery must "appear[] reasonably calculated to lead to the discovery of admissible evidence." CR 26(b)(1).

An agency "must respond to all public disclosure requests without regard to the status or motivation of the requester." *Livingston v. Cedeno*, 164 Wn.2d 46, 53, 186 P.3d 1055 (2008). When enacting RCW 42.56.050 (formerly codified as RCW 42.17.255 (1987)) of the PRA, the legislature stated that "agencies possessing records should in responding to requests for disclosure not make any distinctions in releasing or not releasing records based upon the identity of the person or agency which requested the records." LAWS OF 1987, ch. 403 § 1.

Here, the issue before the superior court was whether the College reasonably interpreted Hood's request and conducted a search "reasonably calculated and therefore adequate" to uncover documents relevant to Hood's records request. *Neigh. All. of Spokane County*, 172 Wn.2d at 720. Whether a search is reasonable is determined on the specific circumstances of each case. *Id.*

The College sought information as to whether Hood had made similarly phrased public records requests to other agencies, whether those agencies sought clarification, whether Hood had sued any other agencies, and finally, whether those agencies were determined by a court of law to have violated the PRA. Contrary to the College's assertion, requests to other agencies could not "shed light on the scope and meaning of" Hood's request to the College. Information regarding other requests made by Hood, even if similar to that made here, had no bearing on whether the College reasonably interpreted Hood's PRA request and conducted an adequate search for responsive documents. *See Livingston*, 164 Wn.2d at 53. Because Hood's prior requests to other agencies were not relevant to the issue before the court, the superior court abused its discretion by ordering Hood to answer the interrogatories.

Notwithstanding any error in compelling responses to the interrogatories, Hood fails to show that the superior court relied on the discovery responses in reaching its decision. Hood argues that information of other requests and other lawsuits prejudiced the superior court as shown by "[t]he trial court's conclusion that 'Hood failed to follow up with specifics' which erroneously presumed he had knowledge of the College's records." Br. of Appellant at 46-47. We disagree.

The superior court's conclusion of law number 2, stated in part:

[T]he College sought clarification by describing the documents it had searched for and asking [Hood] to indicate if he wanted additional documents, but [Hood] did not follow up with specifics.

28

CP at 337.

Here, the superior court acknowledged that Huss described additional documents that were part of the "start of the audit process." CP at 63. This was part of an attempt by Huss to obtain clarification to aid in determining the parameters of a search for responsive records. Hood did not provide any clarification in response to Huss's inquiry either by confirming that he wanted documents at the start of the audit process or that he was interested in documents before the initiation of the audit. Thus, the superior court's observation that Hood failed to "follow up with specifics" is based on the evidence before the court. There is no evidence that the superior court improperly relied on any evidence of Hood making PRA requests to other agencies in reaching its ruling. Because there is no evidence of prejudice stemming from the erroneous discovery order, any error is harmless.[7]

## ATTORNEY FEES

Hood argues that under RCW 42.56.550(4), he is entitled to reasonable attorney fees, including consulting fees,[8] and costs on appeal. Hood also argues that he is entitled to attorney fees, including consulting fees, and costs for the wrongful withholding of the Schierman email even if this court affirms.

RCW 42.56.550(4) provides:

---

[7] Hood also argues that the College litigated in bad faith. Because we conclude that the College acted properly under the PRA in responding to Hood's request as discussed in this opinion, we disagree.

[8] Hood cites no authority that would permit this court to award "consulting fees" to a pro se litigant. *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962).

> Any person who prevails against an agency in any action in the courts seeking the right to inspect or copy any public record or the right to receive a response to a public record request within a reasonable amount of time shall be awarded all costs, including reasonable attorney fees, incurred in connection with such legal action. In addition, it shall be within the discretion of the court to award such person an amount not to exceed one hundred dollars for each day that he or she was denied the right to inspect or copy said public record.

Here, Hood does not prevail. Also, the late disclosure of the Schierman email does not show that the College wrongfully withheld responsive records. Moreover, pro se litigants are not entitled to attorney fees under RCW 42.56.550(4). *See West v. Thurston County*, 168 Wn. App. 162, 195, 275 P.3d 1200 (2012). Therefore, we deny Hood's request for reasonable attorney fees and costs.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Maxa, P.J.

Veljacic, J.